IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHRYN GOLL, ) | |
| ) | Case No. 1:21-cv-5481 |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| ) | |
| ROMAN CATHOLIC DIOCESE OF ) | **JURY TRIAL DEMANDED** |
| JOLIET, ILLINOIS AND CAROL ) | |
| BURLINSKI. ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff, Kathryn Goll ("Kathryn"), by and through her legal counsel, Pietrucha Law Firm, LLC, states and alleges as follows:

## NATURE OF CLAIMS

1. Kathryn brings this 11-count complaint against the Defendants, the Roman Catholic Diocese of Joliet, Illinois ("Diocese") and Carol Burlinski ("Burlinski") for violations to the Family and Medical Leave Act of 1993 ("FMLA"), the Families First Coronavirus Response Act ("FFCRA"), defamation per se and false light, and against Defendant The Diocese for violations to the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act ("Title VII"), the unauthorized use of Kathryn's identity for commercial purposes in violation of the Illinois Right of Publicity Act, unjust enrichment and breach of contract.

## PARTIES

2. Kathryn is a resident of DuPage County, Illinois. Kathryn was a secular, contractual employee of the Diocese but is no longer employed by The Diocese.

3. The Diocese is a district of the Roman Catholic Church and controls 47 Catholic elementary schools including St. Isaac Jogues Catholic School ("St. Isaac") as part of the educational ministry of St. Isaac Jogues Parish ("Parish") in Hinsdale, Illinois. The Diocese was Kathryn's employer but no longer employs Kathryn.

4. Upon information and belief, Burlinksi is a resident of Cook County. Burlinski is employed as the Principal at St. Isaac and was Kathryn's direct supervisor, with the ability to recommend hiring and firing of Kathryn.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, as this action arises under federal law, the FMLA 29 U.S.C. §2601 *et seq.*, the FFCRA §3102 and Title VII §2000e *et seq*.

6. Additionally, this Court has supplemental jurisdiction over pendent state claims, pursuant to 28 U.S.C. §1367, because these claims are so related to the federal claims that they form part of the same case or controversy under Article II of the United States Constitution.

7. Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §1391(b) and (c) because the events giving rise to this lawsuit arose in this District, namely in Hinsdale, Illinois.

## FACTS

### Kathryn's Catholic Life and Employment Before Motherhood

8. Kathryn, a Catholic woman of childbearing age, has been a member of the Catholic community her entire life.

9. Kathryn first interacted with The Diocese in the 1990s, when as a little girl, Kathryn was baptized at the Parish.

10. Kathryn and her family remained members of the Parish, and she attended St. Isaac for elementary school, kindergarten through 8th grade, and then went elsewhere for high school and higher education.

11. Later, while earning her master's degree in special education, Kathryn returned to St. Isaac on or around August 18, 2014, the same school she attended as a child student, but this time she was an employee hired by the Diocese.

12. At all relevant times the Diocese had more than five hundred employees and was an "employer" as defined by Title VII.

13. At all relevant times, Kathryn was an "employee" entitled to the protections of Title VII.

14. Throughout Kathryn's employment, she always met and/or exceeded The Diocese's performance expectations and, as a result, received positive performance feedback from parents, her supervisors and peers. In fact, after starting her position, many parents hired Kathryn as an independent tutor, as highly recommend by St. Isaac.

15. Kathryn worked almost a decade with the Diocese, was named "Exceptional Learners Center Director" and ran St. Isaac's summer school program, including coordinating enrollment.

16. Additionally, Kathryn was recruited to privately tutor students over summer breaks netting a secondary income of about $10,000 a summer, a necessity considering her meager St. Isaac salary of less than $36,000, a great value to the Diocese as Kathryn's advanced education called for much more pay.

**The Diocese provided Kathryn with an employment Renewal Status Form every year of employment, except for in 2021, the year Kathryn took maternity leave**

17. At the beginning of the 2020-2021 school year, St. Isaac's enrollment was almost 500 children in prekindergarten through eighth grade.

18. To plan for enrollment, typically, around February annually, the Diocese through Burlinski sent Kathryn correspondence titled Letter of Intent to Return to Position ("Intent to Return") for each school year, including 2018-2019, 2019-2020, 2020-2021 but not for the 2021-2022 school year.

19. After Kathryn completed the Intent to Return, generally indicating, "I DO", "I am unsure" or "I <u>DO NOT</u>" intend to return, Burlinksi would complete a "Contract Renewal/Non Renewal Recommendation Form" ("Renewal Status Form") recommending renewal, non-renewal or other, noticeably absent for the 2021-2022 school year.

20. On March 13, 2020, the U.S. federal government declared COVID-19 ("COVID-19") a national emergency.

21. Schools nationwide panicked to accommodate students with remote electronic learning due to the highly contagious nature of COVID-19, allowing for an unprecedented amount of remote or work-from-home accommodations to employees and students.

22. Beginning around March 2020, St. Isaac, located in Hinsdale, Illinois, was impacted by COVID-19 and at times switched to remote instruction.

23. On May 19, 2020, after COVID-19 began, but before Kathryn announced she was pregnant, the Diocese and Kathryn entered into a Diocese Elementary School Lay Teacher Contract ("2020-2021 Lay Teacher Contract"), attached hereto as **Exhibit A.**

24.     The next month, in June 2020, Kathryn told Burlinski that Kathryn was pregnant with her husband's child, and that she would eventually need a maternity break from work starting around December 2020.

25.     Around this same time, Kathryn also told Burlinski her birthing hospital had COVID-19 pre-birth quarantine protocols, requiring Kathryn to quarantine after Thanksgiving break.

26.     This pregnancy notification triggered a series of desperate moves by Defendants to make sure Kathryn did not enjoy the benefits of maternity leave owed to her under law.

27.     When Kathryn predicted she would take a full maternity leave, time off from work between Christmas 2020 and Tax Day 2021 (approximately starting maternity leave around December 2020 and ending maternity leave around April 2021), the Defendants did not want to give Kathryn a needed break of job-protected leave.

28.     Instead of accepting Kathryn's plans for maternity leave, Burlinksi suggested Kathryn skip her maternity leave and fully engage in work from home with her newborn nearby, giving Kathryn permission to work remotely after the birth of her baby.

29.     Kathryn refused to skip a true break from work stating she would be taking a bona fide maternity leave but accepted returning to work remotely after her maternity leave.

30.     By Thanksgiving, Kathryn experienced pregnancy complications which required Kathryn to work remotely from home, an accommodation approved on November 23, 2021.

31.     By December 11, 2021, Kathryn's pregnancy complications escalated, forcing Kathryn onto immediate bed rest, and an absence from work.

32. Things didn't go as planned when on December 23, 2021, Kathryn's baby arrived prematurely, and Kathryn unexpectedly had a major surgery, a Caesarean section delivery, requiring extra time off work for Kathryn's medical recovery.

33. Kathryn's family and medical leave required Kathryn to miss work during and the planned timeframe quickly changed when the baby came early and Kathryn had medical complications.

### Defendants Punished Kathryn with Job Loss for Taking Maternity Leave covered under the FMLA and ADA

34. After Kathryn's baby was born, Burlinski quickly turned into a Jekyll and Hyde, first telling Kathryn she could return to work remotely, then changing the promise to Kathryn could return to work in-person, at least in some capacity during the 2020-2021 school year, while at the same time telling other staff not to expect Kathryn's return, as indicated in the attached email dated April 1, 2021, attached hereto as **Exhibit B**.

35. Between the months of December and April, Kathryn communicated with her employer about returning to work, particularly the need for Kathryn to return to work remotely as St. Isaac's was becoming a hotspot for COVID-19 spreading and the baby's pediatrician advised Kathryn not to expose herself as her newborn could easily pick up COVID-19, especially because in March 2021, St. Isaac had a COVID-19 outbreak which led Burlinksi to have St. Isaac students switch from in-person instruction to remote only instruction.

36. Burlinski told the Chicago Tribune that "*It Was My Call*" to have remote only instruction as a precaution against COVID-19 cases, seen below and attached as **Exhibit C**.



Chicago Tribune

HINSDALE SUBURBS

## St. Isaac Jogues in full remote as a precaution after spring break travel

By KIMBERLY FORNEK
PIONEER PRESS | APR 12, 2021 AT 12:16 PM

Carol Burlinski, principal of St. Isaac Jogues Catholic School, (shown in a video on the school's website) explains how students learning remotely from home can see their classmates in the classroom. (St. Isaac Jogues School website)

St. Isaac Jogues Catholic School in Hinsdale will have remote only instruction until April 22, as a precaution against COVID-19 cases that might occur due to many families traveling during the spring break.

St. Isaac Jogues has been open for full day in-person learning since Aug. 24, principal Carol Burlinski said. But after the prior holiday breaks for Thanksgiving and Christmas/New Year, the school had remote only instruction for one week, "both of which proved beneficial," Burlinski said.

37. Even though the Diocese offered Kathryn a contract renewal two months after COVID-19 began, after Kathryn's baby was born, St. Isaac acted as if the contract renewal was cancelled, and even claimed Kathryn owed money for alleged overpayments to Kathryn, at a time when public data reported the Parish applied for two Paycheck Protection Program Loans ("PPP Loan" or "PPP Loans"), totaling nearly $1.5 million.

38. When corresponding about her return to work and her medical insurance, Kathryn was told she owed St. Isaac money for alleged wage overpayments and also that she could not return to work remotely.

39. It was insisted Kathryn repay alleged wage overpayments, even though both the Diocese's PPP Loans for St. Isaac were approved, and the second PPP Loan was approved January 28, 2021, and Hinsdale Bank & Trust Company, National Association lent $736,537.00, with 93 jobs reported, presumably including Kathryn's role.

40. Besides the acceptance of PPP Loans to cover employee paychecks, The Diocese had already promised to pay Kathryn her annual salary as indicated in Kathryn's 2020-2021 Lay Teacher Contract.

41. The 2020-2021 Lay Teacher Contract contradicts any alleged overpayments, and states Kathryn is to receive the "*annual salary of $35,805 which amount shall be paid in 24 equal installments for a 12-month period*" with "*The first payment to be made 7/15/2020*".

42. Additionally, due to COVID-19, Kathryn was unable to find childcare for her newborn baby.

43. Relying on communications with her employer, Kathryn planned to finish out the 2020-2021 school year by teaching remotely starting April 12, 2021 until May 27, 2021, when the school year ended, as she had no real options for childcare.

44. By April 2021, at the conclusion of Kathryn's maternity leave, The Diocese informed Kathryn could not return to work remotely as it would be "*preferential treatment*", even though students had been engaged in remote instruction as indicated in **Exhibit C.**

45. Because St. Isaac indicated Kathryn must teach in-person, Kathryn on April 8, 2021, notified students/parents that St. Isaac would not allow her to remote return to work for the 2020-2021 school year but that she hoped to return as soon as possible.

46. Meanwhile, Burlinski lied to Kathryn stating the Diocese would build around her and convincing Kathryn to work while on FMLA leave, including helping Burlinski interview new staff.

47. Without Kathryn's prior knowledge, on April 22, 2021, Burlinski emailed students/parents stating "*[Kathryn] will not be returning to St. Isaac's.*" and pretending Kathryn was staying at home to be with her baby.

48. However, Kathryn was fully capable of returning to work, desired to return to work and was even fooled into interviewing a candidate who became her replacement, as indicated in emails calling Kathryn the "current Director" just the week before on April 13, 2021.

49. Kathryn did not tell anyone at The Diocese she was permanently leaving her role.

50. Because The Diocese cut Kathryn's employment short, Kathryn lost pay for 2021, worked without pay during her FMLA leave, suffered emotional distress because of her long ties to The Diocese, suffered humiliation, devastation and embarrassment, did not get paid out the length of her 2020-2021 Lay Teacher Contract, was defamed, put in a false light, lost summer tutoring clients and suffered other damages to be proven at trial.

51. After separation, Kathryn scrambled to find a new job and to expand on a secondary part-time position. However, to date, she was unsuccessful in a finding a full-time job that didn't involve an hours-long commute.

52. In August 2021, four months after her separation, Diocese staff reached out to Kathryn expecting her to assist her replacement further.

53. After separation, the Diocese also expected Kathryn to keep advertising for The Diocese and used Kathryn's image and likeness on St. Isaac electronic and print advertisements.

54. Because of the mistreatment, Kathryn's life has been negatively impacted and members of the Catholic community continue to ask her about her alleged decision to leave her job before the school year ended.

### Exhaustion of Administrative Prerequisites

55. On May 17, 2021. Kathryn filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). A copy of that charge is attached here as **Exhibit D**.

56. On September 7, 2021, Kathryn received her EEOC Notice of Right to Sue. A copy of that notice is attached here as **Exhibit E**.

### COUNT ONE
### FMLA RETALIATION
### (29 U.S.C. § 2601 *et seq*)
### (Against All Defendants)

57. Kathryn repeats and realleges paragraphs 1 through 56 hereof, as though fully set forth herein.

58. The Diocese is engaged in commerce or an industry affecting commerce.

59. The Diocese regularly employs at least 50 employees at or within 75 miles of Kathryn's work site.

60. Around June 2020, Kathryn requested family leave from the Diocese, through principal Burlinski, The Diocese's representative, because of the birth of a daughter and in order to care for that infant.

61. In June 2020, Kathryn had been employed by the Diocese for at least 1,250 hours during the previous 12-month period.

62. Defendants violated Kathryn's rights under the FMLA when Defendants denied Kathryn reinstatement to her job when Defendants separated Kathryn on April 22, 2021.

63. Defendants retaliated against Kathryn for exercising her rights under the FMLA.

64. WHEREFORE, Plaintiff requests that judgment be entered against the Defendants and that Kathryn be awarded all remedies to which she is entitled to under the law including: back pay, lost employee benefits, prejudgment interest, front pay, compensatory damages, liquidated damages, injunctive relief, attorney's fees, costs, compensation for increased tax liability and all other relief this court deems just.

## COUNT TWO
## FMLA INTERFERENCE
## (29 U.S.C. § 2601 *et seq*)
## (Against All Defendants)

65. Kathryn repeats and realleges paragraphs 1 through 64 hereof, as if fully set forth herein.

66. Defendants interfered with Kathryn's rights under the FMLA when Kathryn was discouraged from taking maternity leave and was requested to perform work while on FMLA leave.

67. Defendants retaliated against Kathryn for exercising her rights under the FMLA.

68. WHEREFORE, Plaintiff requests that judgment be entered against the Defendants and that Kathryn be awarded all remedies to which she is entitled to under the law including: back

pay, lost employee benefits, prejudgment interest, front pay, compensatory damages, liquidated damages, injunctive relief, attorney's fees, costs, compensation for increased tax liability and all other relief this court deems just.

## COUNT THREE
## EFMLEA RETALIATION
## (FFCRA § 3102 *et*)
## (Against All Defendants)

69. Kathryn repeats and realleges paragraphs 1 through 68 hereof, as if fully set forth herein.

70. The Emergency Family and Medical Leave Expansion Act ("EFMLEA) allowed Kathryn to take paid job-protected leave due to her dependent child's place of care unavailability due to COVID-19.

71. Kathryn attempted to take EFMLEA to care for her child.

72. During Kathryn's EFMLEA, the first ten days should have been unpaid, but the next ten weeks were to be paid at two-thirds the employee's regular salary.

73. Instead of paying Kathryn the proper salary, Defendants attempted payment from Kathryn.

74. WHEREFORE, Plaintiff requests that judgment be entered against the Defendants and that Kathryn be awarded all remedies to which she is entitled to under the law including: back pay, lost employee benefits, prejudgment interest, front pay, compensatory damages, liquidated damages, injunctive relief, attorney's fees, costs, compensation for increased tax liability and all other relief this court deems just.

## COUNT FOUR
## EFMLA INTERFERENCE
## (FFCRA § 3102)
## (Against All Defendants)

75. Kathryn repeats and realleges paragraphs 1 through 74 hereof, as if fully set forth herein.

76. The EFMLEA allowed Kathryn to take job-protected leave due to her dependent child's place of care unavailability due to COVID-19.

77. During Kathryn's EFMLEA, the first ten days should have been unpaid, but the next ten weeks were to be paid at two-thirds the employee's regular salary.

78. Defendants denied Kathryn ten weeks of paid leave to care for her child.

79. Defendants denied Kathryn the right to be restored to her job after her EFMLEA would have been exhausted.

80. WHEREFORE, Plaintiff requests that judgment be entered against the Defendants and that Kathryn be awarded all remedies to which she is entitled to under the law including: back pay, lost employee benefits, prejudgment interest, front pay, compensatory damages, liquidated damages, injunctive relief, attorney's fees, costs, compensation for increased tax liability and all other relief this court deems just.

## COUNT FIVE
## DEFAMATION PER SE
## (Against All Defendants)

81. Kathryn repeats and realleges paragraphs 1 through 80 hereof, as if fully set forth herein.

82. Defendants have made numerous false statements to students, parents and St. Isaac community members that Kathryn abruptly decided not to return to her job due to having a new baby, as if Kathryn is now incapable of working because she birthed a child.

83. These statements have damaged Kathryn's reputation as an active educator and tutor.

84. As alleged above, Defendants have made false statements implying that Kathryn breached her employment contract and that she no longer intends to have a career in education.

85. Defendants made statements knowing they were false or with reckless disregard for their truth or falsity.

86. WHEREFORE, Plaintiff requests that judgment be entered against the Defendants and that Kathryn be awarded all remedies to which she is entitled to under the law, and all other relief this court deems just.

## COUNT SIX
## FALSE LIGHT
### (Against All Defendants)

87. Kathryn repeats and realleges paragraphs 1 through 86 hereof, as if fully set forth herein.

88. As a result of the Defendants' statements and publications, Kathryn was placed in a false light before the public.

89. The false statements are highly offensive to a reasonable person.

90. The Defendants acted maliciously or with reckless disregard as to the truth or falsity of those statements.

91. WHEREFORE, Plaintiff requests that judgment be entered against the Defendants and that Kathryn be awarded all remedies to which she is entitled to under the law, and all other relief this court deems just.

## COUNT SEVEN
## PREGNANCY DISCRIMINATION
## Title VII
## (Against Defendant the Diocese)

92. Kathryn repeats and realleges paragraphs 1 through 91 hereof, as if fully set forth herein.

93. Kathryn's pregnancy was a motivating factor in her termination.

94. The Diocese discriminated against Kathryn on the basis of her pregnancy by denying her job accommodations that non-pregnant workers with other types of medical or physical limitations were regularly granted.

95. As a result of the Diocese's violation of Title VII, Kathryn was harmed physically, mentally and financially.

96. WHEREFORE, Plaintiff requests that judgment be entered against the Diocese and that Kathryn be awarded all remedies to which she is entitled to under the law including: back pay, lost employee benefits, prejudgment interest, front pay, compensatory damages, punitive damages, injunctive relief, attorney's fees, costs, compensation for increased tax liability and all other relief this court deems just.

## COUNT EIGHT
## RETALIATION
## Title VII
## (Against Defendant the Diocese)

97. Kathryn repeats and realleges paragraphs 1 through 96 hereof, as if fully set forth herein.

98. Kathryn engaged in protected activity when she requested maternity leave to recover from her pregnancy.

99. The Diocese retaliated against Kathryn by denying her job accommodations and then firing her.

100. As a result of the Diocese's violation of Title VII, Kathryn was harmed physically, mentally and financially.

101. WHEREFORE, Plaintiff requests that judgment be entered against the Diocese and that Kathryn be awarded all remedies to which she is entitled to under the law including: back pay, lost employee benefits, prejudgment interest, front pay, compensatory damages, punitive damages, injunctive relief, attorney's fees, costs, compensation for increased tax liability and all other relief this court deems just.

### COUNT NINE
### Violation of Illinois Right of Publicity Act
### (765 ILCS 1075)
### (Against Defendant the Diocese)

102. Kathryn repeats and realleges paragraphs 1 through 101 hereof, as if fully set forth herein.

103. Since Kathryn's employment with the Diocese has ended, the Diocese has used Kathryn's name, photographs and images for advertising purposes in print and electronic advertisements.

104. Kathryn has not given written consent for the Diocese to use her identity for commercial purposes.

105. WHEREFORE, Plaintiff requests that judgment be entered against the Defendants and that Kathryn be awarded all remedies to which she is entitled to under the law including: actual

damages, profits derived from the unauthorized use, injunctive relief, punitive damages and all other relief this court deems just.

## COUNT TEN
## Unjust Enrichment
**(Against Defendant the Diocese)**

106. Kathryn repeats and realleges paragraphs 1 through 105 hereof, as if fully set forth herein.

107. Kathryn provided the work, labor and services at the request of the Diocese.

108. The Diocese's refusal to pay Kathryn the wages and the retention of the monies it was obligated to pay to her has unjustly enriched the Diocese at Kathryn's expense.

109. Kathryn is entitled to be made whole for the benefit Defendant has withheld from her.

110. WHEREFORE, Plaintiff requests that judgment be entered against the Diocese and that Kathryn be awarded all remedies to which she is entitled to under the law including: full value payment of her full 2020-2021 Lay Teacher Contract, prejudgment interest, attorney's fees, costs, compensation for increased tax liability and all other relief this court deems just.

## COUNT ELEVEN
## BREACH OF CONTRACT
**(Against Defendant the Diocese)**

111. Kathryn repeats and realleges paragraphs 1 through 110 hereof, as if fully set forth herein.

112. On or about May 16, 2020, Kathryn and the Diocese agreed to terms regarding her employment with the Diocese.

113. Kathryn performed the duties and conditions of her employment, until the Diocese denied her continued employment.

114. The Diocese refused to pay Kathryn payment promised.

115. WHEREFORE, Plaintiff requests that judgment be entered against the Diocese and that Kathryn be awarded all remedies to which she is entitled to under the law including: full value payment of her full 2020-2021 Lay Teacher Contract, prejudgment interest, attorney's fees, costs, compensation for increased tax liability and all other relief this court deems just.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated: October 15, 2021	Respectfully submitted:

PIETRUCHA LAW FIRM, LLC

*/s/ Cynthia N. Pietrucha*
Cynthia N. Pietrucha
Attorney for Plaintiff

Pietrucha Law Firm, LLC
1717 N. Naper Blvd., Suite 200
Naperville, Illinois 60563
cpietrucha@pietruchalaw.com
(630) 344-6370